Mr. Newman. If you may please the Court, Carl Newman on behalf of the appellants. Your Honors, no contempt finding should have been made in this case if the plaintiff could not prove the prima facie case of contempt as the movement. This morning I'd like to address three points primarily. The first, the failure to demonstrate any harm to the plaintiff as a result of the alleged violations, and the absence of any finding of harm by the district court on that score. Second, as to the second motion for contempt, the inability to prove that these, what I'll call the Fayetteville II problem and this mass e-mail, actually violated any clear and unequivocal command of the Court. And then briefly I'll touch on the absence of any consideration of the evidence of substantial compliance or even an acknowledgment that that defense exists. And to begin with the absence of evidence of harm, at JA 624 where the district court purports to lay out a finding of harm to the plaintiff as a result of the alleged violations, there isn't actually a finding of harm. There are instead two reasons the district court gives for why it's not required to make a finding of harm. The first of which is that there's a presumption of harm, according to the district court, in trademark cases. And the second is that there's a liquidated damages clause in the settlement agreement, as between the parties from the consent judgment. Now neither of these excuses the need to prove harm. That is an element of the movement's burden to prove contempt. Substantively, after eBay v. Merck Exchange, as we argue in our brief. We thought the posture of the case was not a violation. That had been determined by a settlement agreement. And so really what we're talking about is the enforcement of a settlement agreement and with its provisions. And the settlement agreement has, at least as applicable here mainly, is 3A, B, and C. And the question is not whether you are harmed, it's whether you violated the agreement and the court order. And it seems to me the court, the settlement agreement says that in connection with each violation, we're not going to penalize, but we're going to award liquidated damage because of the difficulty of assessing damage. But, and of course the court, if there was no damage, the court still could enforce it with an injunction and other types of relief. But I don't think we're at a stage where we focus on the elements of a Lanham Act violation. And if there's a clear violation of that agreement, I don't see the defense of the fact, oh, they weren't harmed. You agreed to it and the court ordered it. And not only in the first one, you didn't even respond to the notices. Your Honor, if I may, this isn't an action for breach of the settlement agreement. These were motions for contempt of the permanent injunction. The permanent injunction doesn't include that liquidated damages clause. I thought the injunction incorporated the settlement agreement. It's a consent decree. Your Honor, the action is the allegations of the contempt motion. Was it incorporated in the court's order? I'm actually not certain that it was, but I believe it was. I'll have to have a better answer when I step up. It was a consent decree. It was a consent decree. And the injunction, which appears at, I believe, basically JA 80 to 81, has paragraphs which, you know, the allegations of these contempt motions were that we violated paragraphs A, B, and C of that consent judgment, of the permanent injunction. They're not allegations that we breached the settlement agreement. And if I may. That is the settlement agreement. The settlement agreements are those provisions. Those provisions were incorporated. Those provisions are also in the settlement agreement, Your Honor. But as to this liquidated damages clause, you know, at JA 186, and as we note in our brief at page 21, that liquidated damages clause contemplates materiality, the idea that by agreeing to a liquidated damages clause we're waiving the element of harm in contempt motions. What element? The idea is that you agreed to do something, and in order to avoid the notion that there's a penalty, the sanction was basically said we can't measure damages. And I can say, for instance, with respect to the second motion, there was actual confusion, several instances of actual confusion, which is damage. But quite apart from that, those are Lanham Act issues. They're not breach of contract or settlement agreement or, in this case, consent decree. It's a settlement agreement incorporated. And, Your Honor, actually that agreement says that the way in which these disputes will be settled is through contempt practice, and that's what the plaintiffs attempted to do here. And both sides agree that this case is really governed by civil contempt law. Civil contempt requires that the plaintiff, as movement in this case, would demonstrate by clear and convincing evidence harm as a result of the alleged violations. And, actually, Your Honor, you just touched on something, which is part of why this liquidated damages clause can't excuse harm in the contempt motion. A liquidated damages clause fixes the calculation of damages. It agrees because it might be difficult to value that it's going to be worth $30,000. Under your theory, what purpose does the settlement agreement serve? I mean, the settlement agreement binds the parties, and it actually, you know, there are a number of provisions in there, including 10 days' notice before any contempt motion can be filed. The liquidated damages clause, if they were able to prove harm, which they failed to do, would say, you know, and that harm is worth $30,000. But we didn't get there because they never demonstrated harm. That's why the district court is failing to find harm, because there isn't clear and convincing of any harm as a result. If I may, on the substantive question, because the district court relies on it, they cite the single district court decision, Rebel Debutant, for the proposition that there's a presumption of harm in trademark cases. First of all, I think that is incorrectly decided after eBay, and this court's unpublished decision, as the plaintiffs in the response brief point out, actually suggests the same. The Third and Ninth Circuits have held post-eBay that there's no more presumption of harm in trademark cases, and the First Circuit has strongly suggested it. I'll also note Rebel Debutant, on its own terms, in refusing to follow eBay, actually distinguishes it by saying, well, eBay was a permanent injunction case, and Rebel Debutant was a preliminary injunction case. But obviously here, we're in the permanent injunction realm. The Liquidated Damages Clause, you know, is only about the calculation. That's really primarily what it's about. And again, I note, there's a materiality component to it. Much like there has to be harm as a result to the plaintiff in the contempt motion, there's a material breach, or material violation, is what's contemplated in that Liquidated Damages Clause. Contempt liability is not strict liability. And if I could turn to the second motion to return to Judge Niemeyer's question as to whether or not there was confusion in the marketplace and potentially harm at the bottom of the allegation of the second motion. You know, first of all, this is the primary problem with the second motion, is that nobody, the district court and the plaintiff, have been unable to identify what clear and unambiguous command of the court order is violated by sending this e-mail. You think Rainbow Holdings soliciting business in the Fayetteville metropolitan area through a flyer that uses its name, Rainbow Holdings, is not doing business? You think that was just gratuitous, or was that part of their business? Your Honor, the problem here is that paragraph C. My question was, were they doing business by soliciting people through that flyer? They're doing business as Rainbow Child Care Center elsewhere in the world. Well, they were enjoined not to do business in the metropolitan, in that area, under the name Rainbow. Respectfully, Your Honor, that's not quite what paragraph C. of the injunction says at JA-81. And, in fact, the limitation that we are only bound as to using the word in Rainbow Design in connection with our business. Defendants and any and all affiliated entities are permanently enjoined from using the word Rainbow in connection with their business, that's Holdings' business, in the Fayetteville metropolitan area. Now, isn't soliciting business under the name Rainbow from people in that area doing business in that area? No, Your Honor. What that clause is designed to capture Well, you said soliciting business is part of doing business. What that clause is designed to capture is their business in the Fayetteville metropolitan area, which would be the Fayetteville Child Care Center. They didn't say they said metropolitan area, doing business in that area. I mean, it precludes them from even opening up another little shop or a front shop that advertises Rainbow. I agree. Okay. But it does bar that. Any doing business in the metropolitan area, not just through the Fayetteville. Now, it's in connection with their business in the Fayetteville metropolitan area, which is the Fayetteville Child Care Center. Now, that limitation Well, that isn't limited to that. Your Honor, I believe that is You just agreed with me that if they went down and opened up a little storefront to market their business, that's doing business also. If we opened up a storefront that was called the Rainbow Child Care Center in the Fayetteville area? No. Just Rainbow Holdings Marketing Center. Marketing their business, generally. I'm not sure that I think that that would be problematic under the order. We're reading different documents then. The limitation in paragraph C to our business in the Fayetteville metropolitan North Carolina area is in there not once but twice. And, in fact, the plaintiffs in their brief I don't even think are arguing that that's what covers it. It seems to me at page 31 of their brief that they're suggesting there's some kind of structural understanding they have of paragraph C and D. I was just reading the words. I read them to you, and you don't seem to acknowledge that soliciting business from the public is doing business. And it seems to me, and then paragraph A is a similar type of thing. Paragraph A isn't what they're alleging that email blast violates in the first place. It's only paragraph C as far as I can understand it. B. I might be mistaken, but I'm fairly confident they think that the email blast violates paragraph C, which the district court didn't say it violated any particular language. B relates to the link. I'm talking about the flyer that advertised Rainbow Holdings in the flyer and was circulated in the area and caused actual confusion among people who showed up at Rainbow School believing that was the social or made phone calls. So the question is the flyer soliciting business in the metropolitan area of Fayetteville, whether that was doing business under the name Rainbow. Your Honor, I believe that it is not a violation of that language in the consent injunction. All right. Fair enough. I hear you. If I could speak briefly on the Fayetteville 2 address, which I'm not entirely sure how much that's even still in dispute. We know there's this issue in the record, and it's fairly clear looking at it's JA 250 is when there is no website at that address, and JA 534 is when that's a blank page. And the plaintiffs have suggested that either of those is contempt. I would argue first that, you know, our position is that the consent judgment only bars us from using that address to advertise the Fayetteville Child Care Center fundamentally. But in either event, whether the webpage doesn't exist or is a blank white page, I would argue that it's not being used at all.  I thought it was being used that if you typed in that link, you'd get to the home page. If you type in that exact address, that page doesn't exist. And so when we go to some length in the brief about this. It didn't link it to the home page of Rainbow Holdings? If you type in that address, which doesn't exist, you end up going down to the source domain, and we go to some length in our brief to talk about this slash, and then you can put anything that doesn't exist and get there. I think you need to answer Judge Nehemiah's direct question. Blank or not, will it lead you to the home page? That's a yes or no, then you can explain. It doesn't lead you to the home page when it's blank. Okay. So the answer is no. Yeah. Okay, to reckon with it. Go ahead. And then just finally, because I'm running short on time, I do want to talk about the consideration of evidence of substantial compliance on the part of my client. So there's this affidavit which appears at JA-306-09 that's part of our response to the second motion for contempt. There's not a single word in the December 14th order that at all acknowledges any evidence of compliance was offered, or even that there is a defense of substantial compliance or reasonable good-faith efforts to comply with the court order. And granted, there are things that the plaintiff is going to say and has said in the motions that we didn't do, but the defense of compliance — and circulating it in the Fayetteville area — is substantial compliance? Your Honor, I do think that it's substantial compliance. And what I want to go into just for a second is about just the technicalities of this e-mail. This is a mass e-mail that gets sent to a huge pile of e-mail addresses. As it turns out, some of the people who received it live in Fayetteville, North Carolina. You know, when you send an e-mail, you don't know the geographical location necessarily of the person who's going to receive it. At the very beginning, Rainbow Holdings keeps coming up with excuses, keeps coming up with responses. They were repeatedly asked to do various things and didn't do them. And it's the same way you're arguing the case. Oh, we had an excuse for it. We didn't see this. We didn't recognize it went there. Well, somebody's in charge of compliance. Somebody is in charge of taking care of accommodating the business to the court order. I couldn't agree more, Your Honor. Nobody thinks that the court order is a polite suggestion. The actions that have been taken and some of them are belated, you know, all of these things have been cured and we're now facing a third and, you know, seems like we'll be looking at an endless series of contempt motions in this case because they're still finding these sort of like third-party websites that have some reference to the old name and they're going to say that's a violation. If the district court isn't going to make them prove any harm to them as a result in bringing these contempt motions, it's going to say each of them is automatically $30,000, we're going to be litigating these contempt motions forever. You know, there's already in this case more docket entries after the case settled than before and that's because of this excessive contempt litigation. With that, I'll reserve the remainder for rebuttal. Thank you, Mr. Newman. Mr. Allen. Before you begin, can I ask you did the consent decree, which has the paragraph 3B and C and so forth, did that parrot the settlement agreement? It parroted the settlement agreement with respect to all of the injunctive provisions, Your Honor. Does that answer the question? How about the liquidated damages? Did it include that too? No, Your Honor, it did not. Okay. The settlement agreement itself included the provisions relating to the 10-day notice to be given originally for the first three violations and it included the liquidated damages provision and it included a notice provision, none of which were in the consent injunction. What was in the consent decree was the paragraphs 3A, B, C, D? That's correct, Your Honor. That's correct. And in our view, this case essentially presents what I think you've acknowledged with your questions and that is the fairly troubling situation of what happens when defendants consistently thumb their nose at the law, the court, and the plaintiffs. And consent decrees are nonetheless, because they're consented, it does not mean you don't have to pay attention to them. What's your understanding today if you typed in the site that's referred to 3C, if you type that in, what's it take you to? I didn't type it in this morning, Your Honor, and it has been a constantly changing date. No, at the time this motion was filed. My recollection, Your Honor, well, I know that at one time what happened is you type it in and it takes you to their home page. Their explanation is that because it doesn't resolve anywhere, every time a page doesn't resolve, it takes you to their home page. But if you look at the record, what you can see in there That's the rainbow.com backslash Fayetteville 2, if you type that in. Yes, sir. And what's interesting is they presented testimony, and this was in their response to the third motion, the one that the judge has ordered an audit. But in response to the third motion, they presented an affidavit in which the computer tech for the law firm gave some examples of how other sites resolve and use CNN.com and the Supreme Court and pointed out that those do all resolve to some page. In each instance that they point out, they resolve to a blank page which said you didn't get where you were going. It doesn't go to the home page. But the fact is that when you decide how a page is going to resolve, that being the technical term, you can have it go anywhere. It just means what happens when you goof up and type something that doesn't exist, which in their case, now that Fayetteville 2 as a page doesn't exist, if you were to type that in, you'd be going to someplace that doesn't exist. And then the question is, what happens when you try to go to a place that doesn't exist? What happens on your screen when that happens? Pardon? What happens on your computer screen? What happens is that without you knowing what's happening, in other words, you don't see the commands that are going through, you end up at a page. And in their case, they made the choice to have you end up at the home page. That is not a choice that is required by computer technology. This is something totally different, unless you wanted to press that any further. There are still proceedings pending right now. And the court has appointed an auditor. And the question is whether any of the circumstances in the appointment of the auditor is an appealable issue at this time, or why is it not just an interlocutory order? Well, we've argued that it is an interlocutory order. We've argued that not only that, but by acquiescing in a second order entered by the court, which reiterated the provisions and gave extra time for the parties to reach an agreement as to the auditor, that that supplanted the order from which they've appealed. And that both because it's interlocutory, no final judgment of contempt has been found with respect to the third motion, and because they consented to an amendment of the order that they have not appealed from, that for both of those reasons, this third motion for contempt is not before the court. Ms. Oliver, is your position that if, and hopefully there won't be any disagreement with the parties in the future, but if there is a future breach and you come there for contempt, do you think if there is a breach, no matter how small or large, you get $30,000 every time you come to court? Well, Your Honor, we haven't asked for $30,000 for each breach, even on the first two motions. But theoretically. Are you entitled to, do you think? I think there has to come a point at which, just as the Supreme Court said with respect to the amount of damages you can get, just in general, there has to be a point where it's unconstitutional to give too much money. I don't think that you can, no matter what that liquidated damages provision says, there has to come a point. So there is a limitation. There's an inherent power of the court to put a limitation, even if it was to set them out. Do you agree with that? Yes, I do. And I think that that's the reason why. If you look at what occurred in the colloquy between the district court and the parties with respect to the third motion, and if you look at his order, I think that's troubling Judge Boyle. I think that he is saying, okay, at what point is it too much? Now, I don't think that the first two were subject to that. Number one, they didn't complain about it. But number two, the amount that's been awarded thus far, $60,000 in damages, is well below what they paid to settle this case in the first place, which was $115,000. So I think that there's a proportionality there which just comes to the mind and says. . . If you would just assess $30,000 for a minimum violation or a technical violation, it may just be a penalty. It might be, Your Honor. I think that's possible. Now, one thing, when the calendar came out and I saw that the court was interested in this when does illiquidated damages become a penalty, that made me think. And unfortunately, what with the snow and everything else, I didn't file Rule 287. But I think there are two cases that might be of interest to the court. And I mentioned them to my opposing counsel. One of those is the Doral case in which this court analyzed whether or not there is a liquidated damages issue. And that is Doral Bank versus Federal Home Loan Mortgage Company. And in that case, you were just assessing what is a penalty versus what is a liquidated damages. When does liquidated damages become a penalty? And then, because that case made it clear that you look at the cases of the state in which the contract, essentially the settlement agreement, occurred, the leading case in North Carolina on that point is Nutten versus Coffield. K-N-U-T-T-O-N versus Coffield. And that's a 1968 case, but it's the one to which all of the cases in North Carolina cite. And one of the things that's kind of interesting in that particular case is that the defendant there made an argument very similar to what the defendants here make, which is it's unfair to impose on us the liquidated damages to which we agree because it's just too much. And the court goes into a fair degree of discussion of where you've got two parties who are represented, commercial entities enter into an agreement. It's pretty hard to say that anything is too much if they agreed to it. Now, I think there does have to come a point at which something is too much. I think if we had asked, for example, in the third motion for $30,000 times each of the 14 violations that we identified, that would be $420,000. I think that would be an awful lot. We didn't do that. I'm quite certain that the district court would not award that much. And I think that that's the reason you've got a district court looking over these things, is to decide when something is moving into penalty versus when it's sitting there at a reasonable amount that the parties did agree to. Let me ask you about the third motion again. The appellants say that there is jurisdiction here either under our theory of pendent jurisdiction or the collateral order doctrine. And their argument is, as I understand it, they will have had to turn over various pieces of information. And they'll have had to pay for the auditor. If it's not a reviewable order now, when would it be reviewable? I don't understand them to be objecting to having to turn over information, Your Honor. I didn't see that in their brief, and it's not an argument that they made to the district court. Which aspect of – I mean, it's not a final order. Correct. But we could have jurisdiction under either of those other two theories. And one of the strings that runs through that is whether or not the action complained of would otherwise be non-reviewable. Correct. So that's what I'm asking you, is how would it be practically reviewable at a later point after they've already turned over all the documents and paid the money? Okay. My understanding is that their objection is to the paying the money. That part would be reviewable as part of the final order because as part of the final order, the judge is going to have to assign costs ultimately. And the fact that this is – and we've put the citations to the rules, et cetera, in the brief. But the fact that it is an interlocutory order means that he retains the power to switch that award at any time before the end of the case. What he's decided is that for now, somebody's got to pay this auditor because they aren't going to work for free. And based on the evidence in front of him, he thinks that it is appropriate that the defendants pay that amount. Now, part of his final decree is going to have to allocate those costs. This is like any expert in a medical malpractice case or anywhere else. When you get to the end of the road, the judge enters a final order and he says who's going to pay how much, whether it's attorney's fees costs and other required expenses. And so when this comes up, if it does, on an appeal from the final judgment, this court will have an opportunity to review and say whether or not that was an appropriate allocation of costs or not. So I don't think it's unreviewable. Ms. Oliver, sort of a peep ahead a little bit. We'll be talking about the third motion, whether or not it's final. It's not final. It's still in discussion. Normally, settling a case promotes judicial efficiency and time and money. This one looks like it's just the opposite. As counsel aptly observed, it's more docket entries post-settlement and pre-settlement. My question goes to this. These next alleged violations that are coming up in the third, they seem to be nationally focused. It seems like there's very little idea of what does it mean to settle your case. If there's an ad that's national and because it's aired in the local area, that's a violation. It even had nothing to do with the market area. There is a limitation to this. And as Judge Niemeyer pointed out, it's the area, the area. But are you saying that any national commercial, for example, or online matter, that is in the atmosphere of cybernetics, if it comes to your part of the town, that's a violation? I mean, I'm just asking, where is it going? Where is the scope of what you agreed to? Well, let me. I'm trying to think what the best way to answer this as it gets to both of the questions you've asked. Because you're asking, essentially, will there ever be an end to this, or are we sort of in a Dombian sun situation going forever? It's so amorphous. It's almost like, go ahead, tell me. Well, when we talk about offering into an area, we attached to one of our briefs that was filed in the district court an example of what the trademark office itself looks at when we're saying, are you offering into an area, is this an adequate specimen of use? And a general national ad would not necessarily be offering into a particular area. For example, they are allowed to operate their website, Rainbow Child Care Center. Nobody says, even though somebody from Fayetteville could go to Rainbow Child Care Center, that's not a violation. That is national. It is not directed at Fayetteville. On the other hand, if what you're doing is targeting your advertising to Fayetteville, that is offering your services in Fayetteville specifically. And that's what's prohibited. When they send to the people that they've got in their database, who are listed in their database as having a Fayetteville address, it would actually have been pretty easy for them to take out those. You can tell that from Mr. Shapiro's declarations. When they send documents, whether they're by email, whether they're by mail or whatever, to a list of addresses in Fayetteville, that's a violation of the order. If they're just advertising out in the who knows where that's got absolutely no connection to Rainbow School in Fayetteville or Rainbow Child Care Center in Fayetteville, North Carolina, that's not a violation. And the court's order, I think, is trying to target the activities to the market to which they're directed. And I think it does that. What happens if there's an ad for Rainbow Child Care Centers generically and it's on Raleigh TV stations? If it's on Raleigh TV stations, I think that they're actually, well, I don't know if they're on Raleigh TV stations, but there certainly are advertising in the Raleigh area for Rainbow Child Care Center. And we have not brought that up as a violation because we don't think it is. It's targeted to a different market. Even though residents of Fayetteville may get that station and see that ad? They might, but it's not part of the Fayetteville metropolitan area. It's not part of their, you know, they divide up television markets by what they're aimed at. And the Raleigh market is distinct from the Fayetteville market. So there are always going to be some incidental carryovers. But you could tell when we went to court, if you look at the transcript of that third motion, essentially what we're telling the judge is, Judge, we don't know what else to do at this point. We need to get this stopped. We need to get it stopped once and for all. That's why we want the audit, so we can figure out exactly what's going on, take care of it, and never have to come back in here again. Because my client is bringing these motions only after it gets reports of confusion. That confusion should have stopped when this consent judgment was entered. And every time we look, and it's not somebody in Raleigh running around with a Rainbow Child Care Center T-shirt. It's somebody in Fayetteville putting on a Rainbow Child Care T-shirt, driving a bus to the schools where my clients pick up the kids, and causing confusion right there as to which kids get on which bus, causing confusion when grandparents come to their schools trying to pick up the kids that aren't there because they're at a different location. What happens if there's a fire and the fire trucks go to the address that Google shows up first on their maps as being Rainbow School, and it isn't Rainbow School? That's our concern. Here this place opened up. Three miles away they had a choice of any logo, name they wanted. They were operating at that time under two different brands. They chose my client's name. They settled themselves in three minutes away, and they continue to send out things suggesting that they're still Rainbow. And that's just not right. Your Honors, what we think at this point is that the appropriate thing to do is to affirm the district court's order on the first two motions, that that's all there is to be done with that, send it back to the judge to assess any additional attorney's fees that he feels are warranted. And then as to the third motion, let him go through and do what he has set out to do, which is to decide, are we being over-pushy? Are we asking for something that's unfair and unreasonable so that we shouldn't get any more money? Are they, in fact, still making inaccurate representations to the court because he found that they were inaccurate before, and they're demonstrably inaccurate in some respects? Are they doing this deliberately? Does that warrant enhancing, possibly moving into criminal sanctions if he decides to do that? I have no doubt that he will give adequate notice and trial and so forth if he decides to do that. Or is another civil penalty warranted? What is it that it's going to take to make this stop? And I think that's a judgment that in the first instance should be made by the district court, and the case should be remanded for him to do so. Thank you, Ms. Sala. Thank you, sir. Mr. Newman, you have a few minutes reserved. Mr. Newman, there's an old maxim about, like when I was practicing law, it says that the law won't do for you what you won't do for yourself. You settled a case, and it looks like you've got a settlement that both parties have a very, very plausible and reasonable view as to what it means, but you're kind of stuck here where we are. You opted not to go the full distance. Instead, now you're here. What are we to do about this? The court is looking at what you did. You consented to it. The court is making the best judgment. Is there abuse of discretion here? Is there error? Your Honor, the error is that these are enforced by contempt motions, and the plaintiffs are not being held to proving contempt. That's the problem. Now, yes, we did agree to this. We're not saying otherwise. And if I could return to Judge Niemeyer's question from before, I confirmed while I was sitting down that the court order does not incorporate the settlement agreement. So the liquidated damages ---- You disagree with what she just represented? I thought it ---- It repeats the injunctive paragraphs, but the liquidated damages clause specifically ---- Well, she explained that. I understood that. Yeah. But the point that I want to make about that ---- It incorporates 3A, B, C, and D, doesn't it? Yeah, but not the liquidated damages clause. Okay, fair enough. And the point I want to make about that is under JTA, there's a suggestion in the plaintiff's briefs about this, that the court's interpreting its own order, but as the liquidated damages clause it is not. It's interpreting an agreement there. It's interpreting an agreement there, which, yeah, which again has a materiality component. It's not a valid agreement, is it? No, absolutely not, Your Honor. Fair enough. I want to address the jurisdictional question in the December 29th order, this audit order, and I'll start with Judge Agee's question if I can. There's a now or never problem. If we don't do the appeal, we've been ordered to undergo an audit and to pay for it now. The district court describes that as a civil contempt sanction. If we don't appeal it now, it will be moot later because the audit will already have been performed. Why not at the end of the case? The only rub is that, I mean, it's like appointing a special master, and normally you assess the special master against the plaintiff, but in this case the court made a determination that there was enough to justify assessing it against the defendant. But why isn't that something that would be taken up as part of the cost at the end of the case? Your Honor, the district court describes it as a civil contempt sanction. I understand. And I would argue it's less like a special master or I believe plaintiffs have argued it's like an independent court-appointed expert. This is really a court-appointed monitor. The court describes the purpose of the auditor as being to detect violations of the injunction. I thought he was going to do an examination and see what is being done and what isn't being done. And to manufacture evidence against us. Manufacture? That's the purpose of undergoing the audit. The plaintiff is not being required to discover this evidence itself, but we're being required to pay for the plaintiff's expert to create an audit to be used against us. I'm saying that the audit doesn't exist on its own, and so we're going to have to pay to create an audit whose only purpose can be to be used against us. They have to pay. It could turn out that you're clean. I mean, we have to undergo the audit in either event. And to go back to the idea that it is really more like a court-appointed monitor, if it's a monitor or if it's some sort of new injunctive relief to order us to undergo an audit, then I think that's appealable under 1292A1. So is your objection to the payment of the money or to the disclosure of information? I mean, really the problem is the audit. We do have a problem with the money because the plaintiff has identified a very expensive audit. Do you argue in your brief that one of the bases, because this goes to the court's jurisdiction as well, that one of your bases is that they want privileged information or it's a burden? Just a burden, Your Honor. I don't know. Certainly we haven't made any objection about privileged information. But if I can for a second talk about the December 29th order, which says I'm not ruling on the third motion for contempt, there is no contempt finding, and then says but I'm sanctioning you anyway to undergo this audit. That's a sanction that I'm not, you know, it doesn't seem to be that that sanction is imposed as a result of a finding of contempt on the third motion. The district court explicitly says he's not making any finding of contempt on the third motion. So are you saying as a matter of law that you can't get the $30,000 back or the court can't split it up in some way at the end of the audit process if it turns out that you're cleaner than the plaintiff says you are? Even if the court can reallocate the cost at the end of the case, we'll still have had to do the audit. What does that constitute? As far as I understand. I thought it is they're looking at your sites and looking at your conduct. The auditor contract that they're talking about in this record is to have somebody spend about I think it's like 40 or 50 hours on site at the Fayetteville Child Care Center to look at our corporate website and potentially be able to take it down to go line by line through every piece of code in our corporate website to look through the Fayetteville Child Care Center's website as well. I mean they're going to do the work, not you. I mean cooperation would have to be required for an audit of that nature, particularly if they're going to have to come on site and inspect things at the Fayetteville Child Care Center. I just want to get to one last question from my colleague because I actually do know what happens when you put in the slash Fayetteville 2 address today. My question was at the time the court made the conclusion. In other words, the court found in the second motion that you were violating, and at that time I thought there was the argument or the suggestion that that link ended up at the home website. I see my time has expired if I'm answering. Answer that. Status at the time the court decided the motion. That's what we're running. Status at the time the court decided the motion, I believe it is still the blank white page. So it would not have resolved to the RainbowCCC.com homepage. Did the court conclude otherwise? The court at J623 has about a single sentence for the Fayetteville 2 problem, and it just says that they're still using the slash Fayetteville 2 address, and I think that's the entirety of the finding. Thank you, counsel. Thank you, Your Honor.
judges: Roger L. Gregory, Paul V. Niemeyer, G. Steven Agee